## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOANNA OBUZOR,** | No. 2:23-cv-1488 |
| **Plaintiff,** | |
| v. | |
| **JESSE CLAYTON, Police Officer; ROSS KENNEDY, Police Officer; ADAM HOOVER, Correctional Officer; JANE DOE, Correctional Officer; ORLANDO HARPER, Warden of Allegheny County Jail; JASON BEASOM, Deputy Warden; CITY OF PITTSBURGH, PENNSYLVANIA; and ALLEGHENY COUNTY, PENNSYLVANIA.** | **FIRST AMENDED COMPLAINT** **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Joanna Obuzor ("Plaintiff" or "Ms. Obuzor"), by and through her undersigned counsel, respectfully files the following First Amended Complaint against Defendants Jesse Clayton, Ross Kennedy, Adam Hoover, Jane Doe, Orlando Harper, Jason Beasom, the City of Pittsburgh, and Allegheny County, and states as follows:

## <u>INTRODUCTION</u>

1.     On October 31, 2021, Plaintiff Joanna Obuzor, a 37-year-old Black woman, parked her car on the side of the street after a late evening catching up with her book club. Feeling herself getting tired, Ms. Obuzor parked her car on the side of the street to take a nap, in order to avoid any possibility of falling asleep at the wheel.  Around 4:00 a.m. the next morning, she was abruptly woken up by police officers, including Defendants Jesse Clayton ("Officer Clayton") and Ross Kennedy ("Officer Kennedy") (collectively, the "Officers").  Rather than

checking on Ms. Obuzor to make sure she was alright and sending her on her way, Officers

Clayton and Kennedy performed an unwarranted field sobriety test on Ms. Obuzor, slammed her

against the vehicle, violently arrested her, and drove her to the Allegheny County Jail ("ACJ"),

where Ms. Obuzor was then stripped down to her bra and skirt and subjected to further excessive

force by ACJ Correctional Officers, including use of a taser that left multiple burn marks across

her back.  During the entire interaction with Officers Clayton, Kennedy, and ACJ Correctional

Officers, Ms. Obuzor was unarmed and posed no threat to the safety of the officers.

2.      Ms. Obuzor spent approximately 15 hours in custody, and left ACJ with several

injuries—including burns across her back, a sprained wrist, a torn ligament in her left elbow, a

fractured right toe, and extensive bruising.  Defendants' actions also caused, and continue to

cause, psychological injury to Ms. Obuzor including mental and emotional distress.  For these

injuries, Ms. Obuzor seeks money damages pursuant to 42 U.S.C. § 1983, as well as injunctive

relief.

## PARTIES

3.      **Plaintiff Joanna Obuzor** is a 39-year-old individual who resides in Allegheny

County, Pennsylvania.

4.      **Defendant Jesse Clayton** is an individual employed by the City of Pittsburgh,

Pennsylvania as a Police Officer, and at all times mentioned herein acted in the course and scope

of his employment and under color of state law.  Officer Clayton is sued in his individual

capacity.

5.      **Defendant Ross Kennedy** is an individual employed by the City of Pittsburgh,

Pennsylvania as a Police Officer, and at all times mentioned herein acted in the course and scope

of his employment and under color of state law.  Officer Kennedy is sued in his individual capacity.

6.     **Defendant Adam Hoover** ("Hoover") is an individual who was employed by ACJ as a Correctional Officer at all times relevant herein, and at all times mentioned herein acted in the course and scope of his employment and under color of state law.  Hoover is sued in his individual capacity.

7.     **Defendant Jane Doe** ("Jane Doe" or "Doe") is an individual employed by ACJ as a Correctional Officer, and at all times mentioned herein acted in the course and scope of her employment and under color of state law.  Jane Doe is sued in her individual capacity. Defendants Hoover and Jane Doe are collectively referred to as the "ACJ COs."

8.     **Defendant Orlando Harper** ("Harper") is an individual employed by ACJ as the Warden, and at all times mentioned herein acted in the course and scope of his employment and under color of state law.  Harper is sued in his individual capacity.

9.     **Defendant Jason Beasom** ("Beasom") is an individual employed by ACJ as the Chief Deputy Warden, and at all times mentioned herein acted in the course and scope of his employment and under color of state law.  Beasom is sued in his individual capacity.  Defendants Harper, Beasom, Hoover, and Jane Doe are collectively referred to as the "ACJ Defendants."

10.    **Defendant Allegheny County, Pennsylvania** (the "County"), charged in its official capacity as a state actor, was and still is a county fully organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania and is responsible for overseeing the policies, procedures, and/or training of employees at the Allegheny County Jail.

11.    **Defendant City of Pittsburgh, Pennsylvania** (the "City"), charged in its official capacity as a state actor, was and still is a municipality fully organized and existing under and by

3

virtue of the laws of the Commonwealth of Pennsylvania and is responsible for overseeing the policies, procedures and/or training of the City of Pittsburgh Police Department.

12.     Defendants are jointly and severally liable for their unconstitutional and tortious conduct set forth herein.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Ms. Obuzor alleges claims arising under 42 U.S.C. § 1983 for violations of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.  This Court has authority to award attorneys' fees pursuant to 42 U.S.C. § 1988.  This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper under 28 U.S.C. § 1391(b)(2), as the events giving rise to Ms. Obuzor's claims occurred in Allegheny County in the Western District of Pennsylvania.

**FACTS**

15.     Plaintiff Joanna Obuzor is a 39-year-old Black woman who resides in Allegheny County, Pennsylvania, and works as the Director of Operations at the Pittsburgh Cultural Trust.

16.     On October 31, 2021, Officers Clayton and Kennedy unlawfully arrested and used excessive force on Ms. Obuzor, resulting in severe physical injuries, as well as psychological injuries including humiliation and mental and emotional distress.  Thereafter, Ms. Obuzor was imprisoned by the ACJ Defendants, who subjected her to further excessive use of force and deprived her of necessary medical treatment, resulting in severe and ongoing physical injuries as well as mental and emotional distress.

## A. Officers Clayton and Kennedy Unlawfully Arrested Ms. Obuzor After Finding Her Sleeping in Her Parked Vehicle on the Side of the Street.

17.     On October 30, 2021, Ms. Obuzor attended a Halloween-themed social gathering organized by her book club.  As part of her costume, Ms. Obuzor wore a skirt and historical, Victorian era-style corset.  The corset constricted the movement of her neck, torso, arms, and shoulders.

18.     Ms. Obuzor arrived at the book club event in the Edgewood/Swissvale neighborhood of Pittsburgh between approximately 7:30 PM and 8:00 PM.  She had dinner at the event and drank three alcoholic beverages over the course of approximately four and a half hours.

19.     Ms. Obuzor left the event just after 12:00 AM.  While driving home from the event, Ms. Obuzor became tired and pulled into a street-parking space on Fifth Avenue in the Oakland neighborhood of Pittsburgh to get some rest.  After parking her vehicle on Fifth Avenue, Ms. Obuzor turned off the vehicle and fell asleep.

20.     Several hours later, around approximately 4:00 AM, Ms. Obuzor woke up to several police cruisers and an ambulance surrounding her car.  There were at least two white male officers in full uniform standing by her driver's side window: Officers Clayton and Kennedy.

21.     Ms. Obuzor opened her door to speak with the Officers.  Officers Clayton and Kennedy asked Ms. Obuzor if she needed any medical attention, but Ms. Obuzor declined, stating that she was simply tired.

22.     Officers Clayton and Kennedy then asked Ms. Obuzor if she had a friend or family member that she could call to drive her home.  Ms. Obuzor responded that she did not, and assured the Officers that she could drive herself home.

23.     Despite Ms. Obuzor's insistence that she did not need someone to drive her home, Officer Clayton requested that she look for her phone to contact a friend or family member.  Ms. Obuzor complied with Officer Clayton's request.  She searched throughout her vehicle and rummaged through her purse, but was unable to locate her phone.

24.     Concerned that rummaging through her purse—and making any sudden movements as a Black woman—could potentially make Officers Clayton and Kennedy nervous, Ms. Obuzor stopped searching for her phone, placed her hands on the steering wheel where Officers Clayton and Kennedy could see them, and said, "Thank you for not shooting me."

25.     Officer Clayton, who was visibly upset by Ms. Obuzor's comment, responded to Ms. Obuzor, "You're one of those."  The Officers' tone shifted markedly, and they asked Ms. Obuzor to step out of the vehicle.  Ms. Obuzor complied.

26.     Officer Clayton then asked Ms. Obuzor if she had been drinking, and she informed Officer Clayton that she had drank the prior evening, but that she was not intoxicated.

27.     Officers Clayton and Kennedy did not ask Ms. Obuzor any follow-up questions, and instead demanded that Ms. Obuzor perform a horizontal gaze nystagmus test used to identify any involuntary jerking in Ms. Obuzor's eye movement.

28.     Horizontal gaze nystagmus tests are often unreliable and inaccurate, and the results of these tests can be affected by many other factors unrelated to alcohol consumption, including medical conditions, eye problems, or injuries.

29.     Officer Kennedy conducted the nystagmus test by instructing Ms. Obuzor to follow a pen with her eyes while Officer Clayton observed.  Ms. Obuzor complied with Officer Kennedy's request and completed the test, and immediately noticed Officer Clayton's visible

disappointment.  Notably, when Officer Kennedy commented that she failed the test because of shaky movement in one eye, Officer Clayton's disappointment went away, and he smiled.

30.     Upon information and belief, Officer Kennedy misrepresented Ms. Obuzor's performance on the nystagmus test in order to fabricate probable cause for arrest.

31.     At no point did the Officers ask Ms. Obuzor to consent to a blood or breathalyzer test to measure Ms. Obuzor's blood alcohol content, and did not conduct such test.

32.     After conducting only the nystagmus test, Officer Clayton informed Ms. Obuzor that she was under arrest and ordered Ms. Obuzor to turn around.  Before Ms. Obuzor could comply with Officer Clayton's order, Officer Clayton aggressively shoved Ms. Obuzor's right shoulder to spin her around and forcefully slammed her into the side of the vehicle.  Officer Clayton proceeded to aggressively pull Ms. Obuzor's arms behind her back to place her in handcuffs; however, due to Ms. Obuzor's restrictive corset, she did not have full range of her arms and had limited motion to place her arms behind her back.  Despite notifying Officer Clayton that his attempts to pull her arms behind her back were hurting her, Officer Clayton continued to yank back Ms. Obuzor's arms.  As a result of Officer Clayton's brazen use of excessive force, Ms. Obuzor suffered a torn ligament in her left elbow and extensive bruising.

33.     At this point, Ms. Obuzor pleaded with passersby to help her, but no help arrived.

34.     Officer Kennedy was close enough to Officer Clayton to observe Officer Clayton pulling back on Ms. Obuzor's arms and slamming her into the vehicle; however, Officer Kennedy did not intervene to protect Ms. Obuzor from Officer Clayton's violent and abusive behavior.

35.     Ms. Obuzor then asked Officers Clayton and Kennedy why they were arresting her; however, neither Officer responded.

7

36.     After handcuffing Ms. Obuzor, the Officers forcefully pulled her by the arms to put her in the backseat of the police cruiser.  Ms. Obuzor once again asked why she was being arrested but received no response.

37.     At no point during the arrest did the Officers inform Ms. Obuzor of the charges against her.

**B.  ACJ Correctional Officers Stripped and Tased Ms. Obuzor Upon Her Arrival to Allegheny County Jail.**

38.     After arriving at ACJ, Officer Clayton turned off his body-worn camera and told Ms. Obuzor to step out of the police cruiser.

39.     Ms. Obuzor refused to leave the police cruiser until Officer Clayton turned his body-worn camera back on.  Officer Clayton complied with Ms. Obuzor's request, and sarcastically asked Ms. Obuzor if she "was happy now."

40.     The Officers then escorted Ms. Obuzor inside of the ACJ, where ACJ Correctional Officers, including the Hoover and Jane Doe, were present.

41.     Once Ms. Obuzor arrived at the ACJ entry room, ACJ Correctional Officers asked Ms. Obuzor to face the wall and place her hands on the wall above her head, to which Ms. Obuzor complied.  Ms. Obuzor then turned her head slightly to ask the ACJ Correctional Officers a question.  Because she was wearing the restrictive corset, her hand lifted off the wall as she turned her head.

42.     As soon as Ms. Obuzor's hand moved, the ACJ Correctional Officers tackled Ms. Obuzor to the floor.  The ACJ Correctional Officers, including, upon information and belief, Defendant Hoover, restrained Ms. Obuzor and tased her multiple times across her back, despite the fact that she did not pose any threat to any of the ACJ Correctional Officers: she was unarmed, fully restrained, and lying face down on the ground.

8

43.     ACJ Correctional Officers then cut off Ms. Obuzor's corset while she was lying face down and restrained on the ground, leaving her in only a bra and skirt, and pulled Ms. Obuzor to her feet.  Ms. Obuzor coughed as she was pulled to her feet, and in response, ACJ Correctional Officers placed a spit shield over Ms. Obuzor's head.

44.     The ACJ Correctional Officers roughly escorted Ms. Obuzor down the hallway to a holding cell, and left her alone in the cell, without shoes, partially undressed, and with visible burn marks across her back, for approximately five hours.

45.     While Ms. Obuzor waited in the cell, two medical professionals came to visit her. She answered all medical questions as prompted, but received no medical treatment for her burns, despite the fact that the burns were clearly visible.

46.     After the medical professionals left her cell, Ms. Obuzor noticed that her right ankle and calf were beginning to swell.  Based on her prior medical history and experience, Ms. Obuzor knew that this swelling was related to her high blood pressure, so she used the call button in her holding cell to seek medical attention.

47.     When the ACJ Correctional Officers, including Officer Jane Doe, responded to the call button, Ms. Obuzor informed them that she needed to take her daily medication for high blood pressure.  In response, Officer Jane Doe warned her against "push[ing] the [call] button," and threatened to detain her further if she sought help again, stating: "I'll see that you're here until tomorrow."

48.     Ms. Obuzor never received her blood pressure medication, despite requesting medical attention several times.

49.     After the first five hours, Ms. Obuzor was finally given a t-shirt, and she remained in the cell for another six hours, until approximately 2:00 PM.

50.     While Ms. Obuzor was waiting in the holding cell for processing, another ACJ Correctional Officer, Officer Harrigan, brought over his supervisor to introduce him to Ms. Obuzor.  The two officers remarked on the extensive bruising visible on Ms. Obuzor's arms, which were developing from the ACJ Correctional Officers' and Officer Clayton's violent and abusive force used against her.

51.     The supervising officer asked if the bruising came from the Officers or ACJ Correctional Officers.  Although the injuries likely came from both parties, Ms. Obuzor, in fear of reprisal from any ACJ Correctional Officers in earshot, responded that the bruises came from the Officers only.

52.     After 11 hours, at approximately 2:00 PM, Ms. Obuzor was escorted to a new holding cell where she waited to see the judge.

53.     While waiting in the new holding cell, Ms. Obuzor asked an ACJ Correctional Officer for an update on when she could expect to see the judge.  The ACJ Officer told Ms. Obuzor to "shut the fuck up," then stepped closer to the cell, lowered his voice, and threatened to "beat [her] ass."

54.     Ms. Obuzor was finally released from ACJ between 7:00 PM and 7:30 PM— approximately 15 hours after she first arrived.  Although the City of Pittsburgh initially brought charges against her for, *inter alia*, public drunkenness, all charges were ultimately dropped.

**C.  <u>Defendants Harper's and Beasom's Involvement in Use of Force Policies and Practices.</u>**

55.     Both Harper and Beasom have a pattern and practice of failing to supervise the ACJ Correctional Officers with respect to compliance with their constitutional duty to refrain from use of excessive force.

56.     As Warden, Defendant Harper is, and at all relevant times was, responsible for the oversight of ACJ, which includes promulgating and enforcing policies, practices, and procedures concerning use of force and officer training.

57.     As Chief Deputy Warden, Defendant Beasom is, and at all relevant times was, responsible for promulgating and enforcing policies, practices, and procedures concerning use of force.  He also oversees the investigation of ACJ Correctional Officers for use of force on individuals confined at ACJ.

58.     When ACJ Correctional Officers use force on incarcerated persons, including those being held in pre-trial detention, Defendants Harper and Beasom learn of those incidents in detail in various ways, including through use-of-force reports and videos recording the incident, written and oral complaints by the incarcerated person against whom force was used, ACJ's internal affairs investigations, and by state-mandated reporting requirements on ACJ's use-of-force data.

59.     For every incident where an officer uses force, including physical assaults, tasers, use of chemical agents such as O/C spray, restraint chairs, or control techniques and pain compliance, ACJ policy requires the officer who applied the force and every officer who witnessed or was involved in the use of force to submit a written report of the incident by the end of their shift.

60.     ACJ policy requires ACJ Correctional Officers to include in their written report pertinent information about the incident necessary to allow the reviewer to assess the appropriateness of the force used, including the date, time, and location of the incident, an account of the events leading to the use of force, a complete description of the incident and reasons for employing force, a description of the method by which force was applied, including

security equipment and weapons used, a description of the incarcerated person's resulting injuries, and other relevant information.  The ACJ shift commander and/or immediate supervisor assembles all reports into a packet and forwarded them, along with a video of the incident and other materials, to the ACJ majors, internal affairs, which includes Defendants Harper and Beasom.  Both Harper and Beasom, therefore, learned or should have learned about the instances of force used against Ms. Obuzor.

61.     As the Deputy Warden of Operations, Defendant Beasom reviews and determines if an officer's use force is reasonable and whether any remedial measures need to be taken, including discipline of the officer(s) involved.  Upon information and belief, Defendants Harper and Beasom review use-of-force incidents and participated in determining whether to take corrective action for subordinate officer's conduct.

62.     The Pennsylvania Department of Corrections ("PA DOC") administrative code and ACJ's statistical reporting policy require that ACJ both document and report monthly the number of times officers used any type of force to the PA DOC and the Allegheny County Bureau of Corrections Department.

63.     Since 2015 and under Defendants Harper and Beasom's administration, the number of uses-of-force dramatically increased in nearly every category—physical assaults, tasers and stun guns, chemical agents, and restraint chairs—while the jail's population decreased.

64.     In 2019, ACJ correctional officers used tasers 146 times, accounting for a full 50% of all uses of tasers in Pennsylvania jails that year.  ACJ had the most instances of taser and stun gun use on detained and incarcerated individuals in the state.

65.     In 2020, Allegheny County yet again outpaced all other county jails across the state in total use of force incidents.

66.     Upon information and belief, Supervisory Defendants reviewed ACJ's use of force statistics, which included figures that showed ACJ had twice the use of force incidents per capita in comparison to all other county jails in the state.  Supervisory Defendants reviewed these statistics when preparing their mandatory reporting.

67.     Upon information and belief, Defendant Harper reviewed these statistics when preparing his mandatory Warden's Report to the Allegheny County Jail Oversight Board, which convenes monthly.  These statistics unquestionably evidence systemic use of excessive force at ACJ.

68.     Despite having actual knowledge of the high rates at which ACJ Correctional Officers use excessive force against those incarcerated at ACJ, both Harper and Beasom failed to adequately train and supervise ACJ COs on how to comply with their constitutional duty to refrain from use of excessive force when interacting with individuals during the booking process.

69.     Defendants have also refused to change ACJ's policies and practices in a way that prevents or ameliorates the unnecessary and inappropriate use of force.

70.     The ACJ COs were acting pursuant to, and within the scope of, the policies, procedures, and training established, promulgated, and enforced by Defendants Harper and Beasom when the ACJ COs engaged in excessive use of force against Ms. Obuzor.

71.     Harper and Beasom's inadequate policies and procedures, coupled with their failure to train and supervise ACJ COs on excessive use of force, were the proximate cause of Obuzor's physical and psychological injuries resulting from the ACJ CO's violent and abusive behavior.

**D.  Defendant City of Pittsburgh's Involvement in Use of Force Policies, Customs, and Practices.**

72.     Defendant City of Pittsburgh, through its Bureau of Police, has a pattern and practice of failing to supervise Pittsburgh police officers with respect to compliance with their constitutional duty to refrain from use of excessive force.

73.     The City of Pittsburgh is, and at all relevant times was, responsible for the oversight of the Bureau of Police, which includes promulgating and enforcing policies, practices, and procedures concerning use of force and officer training.

74.     When police officers use force on individuals, the City of Pittsburgh, through its Bureau of Police, is informed of such use through reports and videos recording the incident, written and oral complaints, and internal affairs investigations.

75.     The Bureau of Police subsequently reviews subject resistance reports ("SRR") and determines if an officer's use of force is reasonable and whether the officer adequately followed Pittsburgh Bureau of Police policies and procedures.  The City and Bureau of Police, therefore, learned or should have learned about the instances of force used against Ms. Obuzor.

76.     The City had notice of at least 3,448 use of force-related incidents in Pittsburgh between 2015-2020, with a total of 6,870 SRRs filed within the five-year span.

77.     Furthermore, between 2015-2020, at least one in 10 arrests involved the use of force.

78.     The most commonly used techniques reported in SRRs for Pittsburgh police officers were forcible handcuffing, as well as grabbing, pushing and pulling—the exact force used against Ms. Obuzor.

79.     In over 80% of the incidents reported between 2015-2020, the officers reported that the reason for using force was to effectuate arrest.

14

80.     In over 25% of the incidents reported between 2015-2020, the officers charged the individuals with alcohol-related offenses.

81.     The disproportionate use of force between Black individuals and White individuals is substantial: between 2015-2020, 57% of Black individuals were reported to have experienced use of force during their arrest, in comparison to 38% of White individuals.

82.     In 2020, throughout every Pittsburgh Bureau of Police Zone, Black individuals were substantially more likely to be arrested than their White, Hispanic, or Asian counterparts.

83.     Despite making up only a quarter of the Pittsburgh population, Black individuals accounted for 65% of arrestees in 2020.

84.     In 2020 alone, 500 incidents of use of force were reported against Black individuals, with the reason for force being to effectuate arrest.  White individuals were reported to have been subjected to use of force to effectuate arrest almost half of the amount of times as Black individuals.

85.     Upon information and belief, the City had knowledge of and reviewed these statistics, which evidence a pattern and practice of excessive use of force when effectuating arrests.

86.     Despite having actual knowledge of the high rates at which police officers use force against individuals, and in particular use force relating to forcible handcuffing, grabbing, pushing, and pulling, the City of Pittsburgh, through its Bureau of Police, failed to adequately train and supervise its police officers on how to comply with their constitutional duty to refrain from use of excessive force when interacting with and arresting individuals.

87.     The Pittsburgh police officers' practice, pattern, and custom of using excessive force relating to handcuffing, grabbing, pushing, and pulling was established and maintained by

the City through their knowing acquiescence and/or tolerance of such actions and behavior by the officers, and the City's failure to prevent the same.

88.     Despite having actual knowledge of the high rates at which police officers use force against Black individuals, the City of Pittsburgh, through its Bureau of Police, failed to adequately train and supervise its police officers on how to comply with their constitutional duty to refrain from use of excessive force when interacting with and arresting Black individuals.

89.     The Pittsburgh police officers' practice, pattern, and custom of using excessive force against Black individuals was established and maintained by the City through their knowing acquiescence and/or tolerance of such actions and behavior by the officers, and the City's failure to prevent the same.

90.     Despite having actual knowledge of the high rates at which police officers use force against individuals while effectuating arrests, the City of Pittsburgh, through its Bureau of Police, failed to adequately train and supervise its police officers on how to comply with their constitutional duty to refrain from use of excessive force when arresting individuals.

91.     The Pittsburgh police officers' practice, pattern, and custom of using excessive force while effectuating arrest was established and maintained by the City through their knowing acquiescence and/or tolerance of such actions and behavior by the officers, and the City's failure to prevent the same.

92.     The City of Pittsburgh has failed to update its policies and practices in a way that prevents or ameliorates the unnecessary and inappropriate use of force.

93.     Officers Clayton and Kennedy were acting pursuant to, and within the scope of, the policies, procedures, and training established, promulgated, and enforced by Defendant City of Pittsburgh when the Officers engaged in excessive use of force against Ms. Obuzor.

94.     The City of Pittsburgh's inadequate policies and procedures, coupled with their acquiescence and/or tolerance of practices, patterns, and customs of using excessive force and their failure to train and supervise police officers on excessive use of force, were the proximate cause of Ms. Obuzor's physical and psychological injuries resulting from Officer Clayton and Kennedy's violent and abusive behavior.

## COUNT I
### Excessive Use of Force in Violation of the Fourteenth Amendment (42 U.S.C. § 1983)
### Defendants Clayton and Kennedy

95.     Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

96.      42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and law.

97.     Ms. Obuzor has a constitutional right to be free from unreasonable seizures of the person, including the clearly established right to be free from the use of excessive force.

98.     At all times relevant hereto, Officers Clayton and Kennedy were acting under color of state law.

99.     Officers Clayton and Kennedy failed to use any form of lesser force or any de-escalation techniques prior to slamming Ms. Obuzor on the side of the vehicle and pulling her arms behind her back to the point where she suffered a torn ligament in her left elbow.

100.     The Officers' decisions to slam Ms. Obuzor into the side of the vehicle and aggressively pull her arms behind her back were objectively unreasonable and violated her right to be free from the use of excessive force.

101.    The Officers' intentional use of force was disproportionate under the circumstances because Ms. Obuzor posed no threat or danger to the Officers or any other person, and was neither actively resisting arrest nor attempting to flee.

102.    Any reasonable officer in the position of Officers Clayton and Kennedy would have known that the force used against Ms. Obuzor was objectively unreasonable and unconstitutional.

103.    Upon information and belief, Officers Clayton and Kennedy purposefully and/or intentionally used such excessive force without justification.

104.    As a result of the Officers' actions, Ms. Obuzor suffered severe physical injuries, including a sprained wrist, a torn ligament in her left elbow, and extensive bruising.  Ms. Obuzor has been subjected to substantial pain and suffering, and was required to undergo extensive physical therapy for her injuries.

105.    As a result of the Officers' actions, Ms. Obuzor also suffered psychological injury, including humiliation, as well as mental and emotional distress.

106.    Ms. Obuzor has incurred and may continue to incur substantial expenses in order to obtain medical care for her injuries.

107.    Ms. Obuzor is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and any such further costs allowable by federal law.

### COUNT II
### Excessive Use of Force in Violation of the Fourteenth Amendment (42 U.S.C. § 1983)
### Defendants Harper, Beasom, and Hoover

108.    Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

18

109.    42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and law.

110.    Ms. Obuzor has a constitutional right to due process of law, including the clearly established right to be free from the use of excessive force.

111.    At all times relevant hereto, Defendants Harper, Beasom, and Hoover were acting under color of state law.

112.    While Ms. Obuzor was in the custody and care of ACJ, the ACJ Correctional Officers, including at least Officer Hoover, tackled Ms. Obuzor to the floor and tased her multiple times while she was unarmed, fully restrained, and lying face down on the ground.

113.    The ACJ Correctional Officers, including at least Officer Hoover, failed to use any form of lesser force or any de-escalation techniques prior to tackling and tasing Ms. Obuzor.

114.    Officer Hoover's use of force in tackling and tasing Ms. Obuzor, rather than attempting an alternative, lesser means of force or de-escalation technique, constitutes force that is objectively unreasonable and in violation of Ms. Obuzor's clearly established right to be free from excessive force under the Fourteenth Amendment.

115.    Officer Hoover's use of force was disproportionate under the circumstances because Ms. Obuzor posed no threat or danger to any of the officers or any other person, and was neither actively resisting arrest nor attempting to flee.

116.    Any reasonable officer in the position of Officer Hoover would have known that the force used against Ms. Obuzor was objectively unreasonable and unconstitutional.

117.    Upon information and belief, Officer Hoover purposefully and/or intentionally used such excessive force without justification.

118.    Defendants Harper and Beasom are liable for their individual involvement in failing to train and supervise ACJ Correctional Officers, including Officer Hoover.

119.    Defendants Harper and Beasom are liable for their individual involvement in failing to enforce policies and/or procedures which existed or should have existed relating to the use of excessive force by ACJ Correctional Officers, including Officer Hoover.

120.    Defendants Harper and Beasom acted with objective unreasonableness and/or deliberate indifference to the need to train ACJ Correctional Officers, including Officer Hoover, and to the consequences of failing to train and prevent ACJ Correctional Officers from using excessive force on detainees.

121.    Defendants Harper and Beasom's failure to train ACJ Correctional Officers, including Officer Hoover, resulted in the unlawful assault on Ms. Obuzor and violated Ms. Obuzor's right to be free from the use of excessive force under the Fourteenth Amendment.

122.    As a result of Officer Hoover's actions, Ms. Obuzor suffered severe physical injuries, including burns across her back, a fractured toe, and extensive bruising.  Ms. Obuzor has been subjected to substantial pain and suffering, and was required to undergo extensive physical therapy for her injuries.

123.    As a result of Officer Hoover's actions, Ms. Obuzor suffered psychological injury, including humiliation, as well as mental and emotional distress.

124.    Ms. Obuzor is entitled to compensation for such injuries pursuant to 42 U.S.C. 1983 in an amount to be proven at trial, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and any such further costs allowable by federal law.

## COUNT III
## Unlawful Arrest in Violation of the Fourth Amendment (42 U.S.C. § 1983)
### Defendants Clayton and Kennedy

125.   Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

126.   42 U.S.C. § 1983 provides an action in law and equity against anyone who under color of state law deprives another of rights secured by the Constitution and law.

127.   Ms. Obuzor has a clearly established constitutional right to be free from unreasonable searches and seizures, including the right to be free from arrest without probable cause.

128.   At all times relevant hereto, Defendants were acting under color of state law.

129.   On October 31, 2021, Officers Clayton and Kennedy arrested Ms. Obuzor without probable cause.  Ms. Obuzor exhibited no signs of intoxication when the Officers arrived at the scene, and in the absence of such signs, the Officers had no reasonable grounds to believe that Ms. Obuzor was intoxicated.

130.   The Officers failed to offer Ms. Obuzor a blood test or a breathalyzer test to determine her blood alcohol content.

131.   The Officers violated Ms. Obuzor's clearly established constitutional right to be free from unreasonable searches and seizures, including the right to be free from arrest without probable cause, by arresting her without probable cause of public drunkenness.

132.   As a result of Officers Clayton's and Kennedy's actions, Ms. Obuzor suffered humiliation, as well as mental and emotional distress.

133.     Ms. Obuzor is entitled to compensation for such injuries pursuant to 42 U.S.C. §

1983 in an amount to be proven at trial, as well as attorneys' fees and costs pursuant to 42 U.S.C.

§ 1988, pre-judgment interest, and any such further costs allowable by federal law.

**COUNT IV**
**Deprivation of Necessary Medical Treatment in Violation of the Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**Defendants Harper, Beasom, and Jane Doe**

134.     Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above

as if fully set forth and restated herein.

135.     42 U.S.C. § 1983 provides an action in law and equity against anyone who under

color of state law deprives another of rights secured by the Constitution and law.

136.     Ms. Obuzor has a constitutional right to due process of law, including the clearly

established right to be free from punishment such as the deprivation of necessary medical

treatment.

137.     At all times relevant hereto, Defendants Harper, Beasom, and Officer Jane Doe

were acting under color of state law.

138.     While in the custody and care of ACJ, Ms. Obuzor suffered from high blood

pressure-related swelling, a medical condition requiring access to medication.  Despite having

knowledge of Ms. Obuzor's need for medical attention, Officer Jane Doe showed deliberate

indifference to Ms. Obuzor's medical needs by refusing her access to blood pressure medication

and threatening to detain her for a longer period of time if she continued to seek help.  Such

unlawful actions put Ms. Obuzor at severe risk of additional harm and undue suffering.

139.     Officer Jane Doe, as a direct and proximate result of her deliberate indifference to

Ms. Obuzor's medical needs, caused Ms. Obuzor to suffer continuous injuries, such as bruising,

swelling, and elevated blood pressure, while in ACJ's custody and care.

140.     Officer Jane Doe's deprivation of necessary medical treatment constitutes punishment in violation of Ms. Obuzor's clearly established right to due process under the Fourteenth Amendment.

141.     Defendants Harper and Beasom are liable for their individual involvement in failing to train and supervise ACJ Correctional Officers, including Officer Jane Doe.

142.     Defendants Harper and Beasom are liable for their individual involvement in failing to enforce policies and/or procedures which existed or should have existed relating to ACJ Correctional Officers' response to requests for necessary medical treatment.

143.     Defendants Harper and Beasom acted with objective unreasonableness and/or deliberate indifference to the need to train ACJ Correctional Officers, including Officer Jane Doe, and to the consequences of failing to train ACJ Correctional Officers on appropriate responses to requests for necessary medical treatment.

144.     Defendants Harper and Beasom's failure to train ACJ Correctional Officers, including Officer Jane Doe, violated Ms. Obuzor's right to due process of law.

145.     As a result of Defendants Harper, Beasom, and Jane Doe's actions, Ms. Obuzor suffered severe physical injuries, as well as emotional and mental distress.

146.     Ms. Obuzor is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and any such further costs allowable by federal law.

## COUNT V
### Failure to Train and Supervise
### (42 U.S.C. § 1983)
**Defendants City of Pittsburgh, Pennsylvania and Allegheny County, Pennsylvania**

147.     Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

23

148.    Upon information and belief, the City and the County are both state entities who were acting under color of law when Ms. Obuzor was subjected to excessive use of force in Pittsburgh, Pennsylvania on October 31, 2021.

149.    Ms. Obuzor has a clearly established constitutional right to be free from unreasonable searches and seizures, including the right to be free from arrest without probable cause.

150.    Ms. Obuzor has a clearly established constitutional right to be free from the use of excessive force.

151.    On October 31, 2021, Ms. Obuzor was arrested without probable cause, despite exhibiting no signs of intoxication when the Officers arrived at the scene, and in the absence of such signs, the Officers had no reasonable grounds to believe that Ms. Obuzor was intoxicated.

152.    While in the custody of the City, Ms. Obuzor was subjected to the use of excessive force when she was slammed into the side of the vehicle and had her arms pulled behind her back to the point where she suffered a torn ligament in her left elbow.

153.    The Officers' decisions to slam Ms. Obuzor into the side of the vehicle and aggressively pull her arms behind her back were objectively unreasonable and violated her right to be free from the use of excessive force.

154.    While confined at the ACJ, Ms. Obuzor was subjected to further excessive use of force when she was tackled to the ground and tased multiple times.

155.    Upon information and belief, the City knew or should have known that its police officers have a pattern or custom of conducting arrests without probable cause resulting in the violation of the federally-protected civil rights of the City of Pittsburgh's citizens, including Ms. Obuzor.

156.    Upon information and belief, the City and the County knew or should have known that their officers have a pattern or custom of using excessive force resulting in the violation of the federally-protected civil rights of the City of Pittsburgh's and the County of Allegheny's citizens, including Ms. Obuzor.

157.    At all times relevant herein, the City and the County had in effect practices, patterns, and customs that condoned, fostered, and furthered the unconstitutional conduct of the individual Defendants, which practices, patterns, and customs were a direct and proximate cause of the harm Ms. Obuzor suffered.

158.    Ms. Obuzor's encounter with the Officers is one of the many encounters, of which the City of Pittsburgh is aware of, in which Black individuals in the Pittsburgh area are disproportionately subjected to use of force during arrests.

159.    At all times relevant herein, upon information and belief, the City implemented practices, patterns, and customs of arresting suspects without sufficient probable cause or reasonable suspicion.

160.    At all times relevant herein, upon information and belief, the City implemented practices, patterns, and customs of intimidating and harassing Black individuals while effectuating arrest.

161.    At all times relevant herein, upon information and belief, the City and the County implemented practices, patterns, and customs of using excessive force where such force was not warranted.

162.    The City and County are liable for their involvement in failing to enforce policies and/or procedures which existed or should have existed relating to the Officers' unlawful arrest

and excessive use of force, and the ACJ COs' excessive use of force and deprivation of necessary medical treatment.

163.    The City and County are liable for their involvement in acquiescing to and/or tolerating patterns and customs which existed relating to the Pittsburgh police officers' custom of arresting individuals without probable cause and using excessive force while effectuating arrests, and the ACJ Correctional Officers' custom of using excessive force and depriving individuals of necessary medical treatment.

164.    Upon information and belief, the City knew of such patterns and customs and failed to take precautions against future violations, and Ms. Obuzor's injuries were a direct and proximate result of such failure and inaction.

165.    Upon information and belief, the County knew of such patterns and customs and failed to take precautions against future violations, and Ms. Obuzor's injuries were a direct and proximate result of such failure and inaction.

166.    The City acted with objective unreasonableness and/or deliberate indifference to the need to train and supervise Pittsburgh police officers, including Officers Clayton and Kennedy, and to the consequences of failing to train Pittsburgh police officers on appropriate use of force and unlawful arrests.

167.    The County acted with objective unreasonableness and/or deliberate indifference to the need to train and supervise ACJ Correctional Officers, including Hoover, and to the consequences of failing to train ACJ Correctional Officers on appropriate use of force.

168.    The County acted with objective unreasonableness and/or deliberate indifference to the need to train and supervise ACJ Correctional Officers, including Jane Doe, and to the

consequences of failing to train ACJ Correctional Officers on appropriate responses to requests for necessary medical treatment.

169.    The City consciously disregarded the illegality and unconstitutionality of the unwarranted arrests and excessive use of force.  Such practices and customs were a direct and proximate cause of the unconstitutional conduct alleged herein.

170.    The County consciously disregarded the illegality and unconstitutionality of the excessive use of force.  Such practices and customs were a direct and proximate cause of the unconstitutional conduct alleged herein.

171.    As a proximate result of its actions and inactions, the City deprived Ms. Obuzor of the rights, remedies, privileges, and immunities granted to every person, secured by 42 U.S.C. § 1983, and subjected her to an arrest without probable cause in violation of the Fourth Amendment to the United States Constitution.

172.    As a proximate result of their actions and inactions, the City and the County deprived Ms. Obuzor of the rights, remedies, privileges, and immunities granted to every person, secured by 42 U.S.C. § 1983, and subjected her to excessive use of force in violation of the Fourteenth Amendment of the United States Constitution.

173.    As a proximate result of the City's conduct, Ms. Obuzor suffered direct physical harm due to the Officers' wrongful arrest, confinement, and excessive use of force.

174.    As a proximate result of the County's conduct, Ms. Obuzor suffered direct physical harm due to the ACJ COs' excessive use of force and deprivation of necessary medical treatment.

175.    Ms. Obuzor is entitled to compensation for such injuries pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and any such further costs allowable by federal law.

### COUNT VI
### False Arrest (State Law Claim)
### Defendants Clayton and Kennedy

176.    Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

177.    Ms. Obuzor has a clearly established right under Pennsylvania law to be free from arrest without probable cause.

178.    On October 31, 2021, Officers Clayton and Kennedy arrested Ms. Obuzor without probable cause.  Ms. Obuzor exhibited no signs of intoxication when the Officers arrived at the scene, and without such signs, the Officers had no reasonable grounds to believe that Ms. Obuzor was intoxicated.

179.    The Officers failed to offer Ms. Obuzor either a blood test or a breathalyzer test to determine her blood alcohol content.

180.    As a result of Officers Clayton's and Kennedy's actions, Ms. Obuzor suffered humiliation, as well as mental and emotional distress.

181.    Ms. Obuzor is entitled to compensation for such injuries under Pennsylvania law.

<u>COUNT VII</u>
<u>Civil Conspiracy (State Law Claim)</u>
**Defendants Clayton and Kennedy**

182.    Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

183.    Officers Clayton and Kennedy jointly committed an unlawful arrest and unconstitutional use of force upon Ms. Obuzor, and neither Officer restrained or prevented the other from engaging in such unlawful and unconstitutional behavior.

184.    Upon information and belief, Officers Clayton and Kennedy acted in concert with one another in the unlawful arrest of Ms. Obuzor, and developed, agreed upon, and executed a common plan, scheme, or design to fabricate probable cause to arrest Ms. Obuzor by misrepresenting her performance during the nystagmus test.

185.    Upon information and belief, Officers Clayton and Kennedy acted in concert with one another in the unlawful assault on Ms. Obuzor, and developed, agreed upon, and executed a common plan, scheme, or design to use excessive force against Ms. Obuzor.

186.    Upon information and belief, Officers Clayton and Kennedy further agreed to fabricate a false narrative depicting Ms. Obuzor as aggressive and uncooperative in order to excuse and/or justify their unconstitutional excessive use of force upon Ms. Obuzor.

187.    At all relevant times, Officers Clayton and Kennedy acted in concert with one another through an express or implied agreement to commit the unlawful acts described herein, with the principal purpose of inflicting injury upon Ms. Obuzor and depriving Ms. Obuzor of her constitutional right to be free from excessive use of force and her right of due process.

188.    Ms. Obuzor's injuries and deprivation of her constitutional rights were the natural and foreseeable consequences of the Officers' conspiracy alleged herein.

189.   The Officers are jointly and severally liable for the injuries caused by their co-conspirator.

190.   As a result of the civil conspiracy developed, entered into, and executed by Officers Clayton and Kennedy, Ms. Obuzor suffered substantial physical and psychological injury, as well as a deprivation of her constitutional rights.

## COUNT VIII
### Assault and Battery (State Law Claim)
### Defendants Clayton, Kennedy, and Hoover

191.   Ms. Obuzor repeats and realleges the allegations set forth in the paragraphs above as if fully set forth and restated herein.

192.   Officer Hoover attempted to cause, or intentionally, knowingly, or recklessly caused physical injury to Ms. Obuzor when Officer Hoover tackled Ms. Obuzor to the ground, restrained her, and tased her across her back multiple times, resulting in severe physical injuries.

193.   Officers Clayton and Kennedy attempted to cause, or intentionally, knowingly, or recklessly caused physical injury to Ms. Obuzor when Officers Clayton and Kennedy violently shoved Ms. Obuzor, slammed her into the side of the vehicle, and aggressively pulled back her arms, resulting in severe physical injuries.

194.   Ms. Obuzor's physical injuries are a direct and proximate result of Defendants Clayton, Kennedy, and Hoover's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joanna Obuzor requests the following relief:

(a)     An order declaring that the wrongful conduct described in this Complaint violated Ms. Obuzor's rights under the Fourth and Fourteenth Amendments to the United States Constitution;

(b)     An award of compensatory and punitive damages in an amount to be determined at trial;

(c)     An award of reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

(d)     An order granting appropriate injunctive relief, including implementation of training protocols to prevent future conduct similar to the conduct complained of herein;

(e)     Any such other and further relief as this Court may deem appropriate and just.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 20, 2023

Respectfully,

*/s/ Kira M. Geary*_____
David R. Osipovich (PA ID No. 306687)
Anna Shabalov (PA ID No. 315949)
Jessica L.G. Moran (PA ID No. 325912)
Kira M. Geary (PA ID No. 330334)
**K&L GATES LLP**
K&L Gates Center
210 Sixth Ave.
Pittsburgh, PA 15222
Tel: (412) 355-6578
david.osipovich@klgates.com
anna.shabalov@klgates.com
jessica.moran@klgates.com
kira.geary@klgates.com

-and-

Kelsi E. Robinson (PA ID No. 330452)
**K&L GATES LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Tel: (310) 552-5060

kelsi.robinson@klgates.com

***Attorneys for Plaintiff Joanna Obuzor***